**In re: PHILIP SERVICES CORPORATION SECURITIES LITIGATION.**

**Robert W. Hillger, on behalf of himself and all others similarly situated, Plaintiff,**

**v.**

**Philip Services Corporation, Allen Fracassi, Marvin Boughton, and Robert Waxman, Defendants.**

**Nos. M–21–77; 98 CIV. 835(MBM), MDL 1230(MBM).**

United States District Court, S.D. New York.

May 4, 1999.

Opinion Denying Reconsideration and Granting Motion to Amend in Part June 17, 1999.

---

Neil L. Selinger, Jeanne F. D'Esposito, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Co–Lead Counsel for Plaintiffs.

Jeffrey C. Block, Michael T. Matraia, Berman DeValerio & Pease, LLP, Boston, MA, Co–Lead Counsel for Plaintiffs.

Samuel Kadet, James W. Brown, Skadden, Arps, Slate, Meagher & Flom, LLP; New York City, for Defendant Philip Services Corp.

Gerald A. Novack, David S. Versfelt, Kirkpatrick & Lockhart, LLP, New York City, for Defendants Allen Fracassi, Philip Fracassi, Marvin Boughton, Colin Soule and John Woodcroft.

Stuart L. Shapiro, Michael I. Allen, Shapiro Forman & Allen, LLP, New York City, for Defendants Roy Cairns, Derrick Rolfe, Felix Pardo and Herman Turkstra.

Frederick P. Schaffer, Schulte Roth & Zabel, LLP, New York City, for Defendant Norman Foster.

James Serota, Vinson & Elkins, LLP, New York City, Co–Counsel for Defendant William E. Haynes.

Charles W. Schwartz, Vinson & Elkins, LLP, Houston, TX, Co–Counsel for Defendant William E. Haynes.

Craig R. Smyser, Larry K. Veselka, Asim Bhansali, Smyser Kaplan & Veselka, LLP, Houston, TX, for Defendant Robert L. Knauss.

John R. Behrendt, Robert F. Serio, Marshall R. King, Gibson Dunn & Crutcher, New York City, for Defendant Deloitte & Touche.

Brad S. Karp, Michael E. Gertzman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for the Underwriter Defendants.

J. Lawrence Crocker, Slotnick, Shapiro & Crocker, LLP, New York City, for Defendant Robert Waxman.

## OPINION AND ORDER

MUKASEY, District Judge.

In this consolidated class action, plaintiffs sue Philip Services Corporation ("PSC"), several of its current and former officers and directors, 17 underwriters (the "Underwriter Defendants") and Deloitte & Touche ("Deloitte"), alleging violations of several federal securities laws. Defendants move to dismiss plaintiffs' Consolidated and Amended Class Action Complaint (the "complaint") on *forum non conveniens* grounds. In addition, defendants Deloitte, William Haynes and Robert Knauss move to dismiss for failure to state a claim. For the reasons stated below, defendants' motion to dismiss on *forum non conveniens* grounds is granted, and plaintiffs' complaint is dismissed. In light of this outcome, the motions to dismiss for failure to state a claim will not be treated.

### I.

The following facts are relevant to this motion. PSC, a Canadian corporation, is "an integrated resource recovery and industrial services company, which provides metal recovery and processing services, by-products recovery and industrial services to major industry sectors throughout North America." (Compl.¶ 48) The company's principal executive offices are in Ontario, Canada; its U.S. corporate headquarters are in Pittsburgh, Pennsylvania. (*Id.*) PSC's stock is traded on the New York Stock Exchange ("NYSE"), the Toronto Stock Exchange and the Montreal Stock Exchange, and, prior to April 30, 1996, was traded also on the NASDAQ market. (*Id.*)

Between 1992 and 1997, PSC sought to expand its revenue base, its range of services and its network of facilities throughout North America. (*Id.* ¶ 164) To the extent relevant here, this expansion effort took two forms. First, in 1997, PSC acquired two companies—Allwaste, Inc. ("Allwaste") and Serv–Tech, Inc. ("Serv–Tech")—in stock-for-stock deals worth a total of approximately $560 million. (*Id.* ¶ 165) Second, in November 1997, PSC completed two secondary public offerings, which together raised approximately $380 million. (*Id.* ¶¶ 1–2) One offering, which

raised approximately $284 million, was made exclusively to U.S. investors, and was underwritten by 17 American securities firms, the Underwriter Defendants. (Selinger Aff. ¶¶ 6–11) The other offering, which raised approximately $94 million, was made only to investors outside the United States, and was underwritten by eight Canadian securities firms (the "Canadian Underwriters"). (*Id.* ¶¶ 8–10) In connection with the acquisitions of All-waste and Serv–Tech and the U.S. public offering, PSC filed registration statements with the Securities and Exchange Commission ("SEC"). (Compl. ¶ 1)

On January 26, 1998, PSC announced that it would take "charges to earnings" for fiscal year 1997 of between $250 and $275 million. (*Id.* ¶¶ 7, 346) Over the next several months, this figure was raised to over $381 million, of which $125 million was reported to arise from overstated copper inventory and unrecorded copper-trading losses. (*Id.* ¶¶ 6–7, 9–11, 130, 346) In addition, PSC issued revised financial statements for fiscal years 1995, 1996 and 1997. (*Id.* ¶¶ 353, 357, 359) The revised statements disclosed that 1995 earnings had been overstated by approximately $22.5 million, or 690%, and that 1996 earnings had been overstated by $48.3 million. (*Id.* ¶¶ 3, 319) Thus, instead of posting a $28.4 million gain in 1996, as PSC had initially reported, the company recorded losses totaling approximately $20 million. (*Id.* ¶ 3) Due at least in part to these announcements, the share price of PSC stock dropped from $13⅛ on January 16, 1998 to $2⁹⁄₁₆ in July 1998, a loss of approximately 80%. (*Id.* ¶ 13)

Unsurprisingly, PSC's announcements and the drop in its share price loosed a torrent of litigation. In Ontario, Joseph Menegon filed a class action (the "Menegon Class Action") on behalf of himself and all other "persons in Canada who held and/or purchased common shares of [PSC] between February 28, 1996 and April 23, 1998" against PSC, Deloitte and the Canadian Underwriters. (Serio Decl. ¶ 5 & Ex.

D, ¶ 1) Additionally, PSC itself filed a lawsuit in Ontario against, *inter alia,* Robert Waxman—the former President of PSC's Metals Recovery Group and one of the defendants here—and Greg Madesker and Rik Barrese, metals traders who worked under Waxman, alleging that they perpetrated fraud at PSC. (Serio Decl. ¶ 6 & Ex. E)

In the United States, more than 20 class action lawsuits were commenced, in various jurisdictions, against some combination of the defendants here. These actions were transferred to this court by the Judicial Panel on Multidistrict Litigation and consolidated for pre-trial purposes. Thereafter, plaintiffs filed an amended complaint, alleging violations of (1) sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), 78t; (2) SEC Rule 10b–5, 17 C.F.R. § 240.10b–5; and (3) sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k, 77*l*(a)(2), 77*o*. (Compl. ¶ 15) Specifically, plaintiffs charge PSC with making materially false and misleading statements concerning its publicly reported revenues, earnings, assets and liabilities. (*Id.* ¶ 2) In addition, they seek to hold Deloitte liable in connection with its audits of PSC in 1995, 1996 and 1997 (*id.* ¶¶ 277–336), and to hold the Underwriter Defendants liable in connection with the November 1997 public offering. (*Id.* ¶¶ 337–45) Deloitte is a partnership organized under the laws of Ontario, and all its partners are Canadian citizens. (Matz Decl. ¶ 2) The 17 Underwriter Defendants are based in the United States, although seven of the firms conduct business in Canada also. (Selinger Aff. ¶¶ 9, 12 & n. 1)

## II.

The doctrine of *forum non conveniens* permits a court to decline jurisdiction on the ground that adjudication in a foreign forum is more appropriate and convenient. The *forum non conveniens* analysis proceeds in two steps. First, the

court must determine whether an "adequate alternative forum" exists for litigation of the plaintiff's claims. *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998) (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)). Second, assuming there is such a forum, the court must weigh the public and private interest factors identified by the Supreme Court in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), to determine which forum "will be most convenient and will best serve the ends of justice." *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996).

In making this inquiry, "[t]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum." *Murray v. British Broad. Corp.,* 81 F.3d 287, 290 (2d Cir.1996) (citations omitted); *accord Piper,* 454 U.S. at 255, 102 S.Ct. 252. Thus, "dismissal usually is not appropriate unless 'the balance of convenience tilts strongly in favor of trial in the foreign forum.'" *Alfadda,* 159 F.3d at 46 (quoting *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991)); *accord Capital Currency Exch., N.V. v. National Westminster Bank PLC,* 155 F.3d 603, 609 (2d Cir.1998), *cert. denied,* No. 98–1308, 119 S.Ct. 1459, 143 L.Ed.2d 545 (Apr. 19, 1999). Nevertheless, where, as here, plaintiffs proceed in a representative capacity, their choice of forum is entitled to less weight. *See Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); *DeYoung v. Beddome,* 707 F.Supp. 132, 138 (S.D.N.Y.1989) (citing *Koster,* 330 U.S. at 523–27, 67 S.Ct. 828); *see also Shulof v. Westinghouse Elec. Corp.,* 402 F.Supp. 1262, 1263 (S.D.N.Y.1975) ("While it is axiomatic that a plaintiff's choice of forum is entitled to great consideration, the adage has little weight in stockholder class actions . . . ." (citing *Koster,* 330 U.S. at 524, 67 S.Ct. 828)). Such plaintiffs "have only a

small direct interest in a large controversy in which there are many potential plaintiffs, usually in many potential jurisdictions." *DeYoung,* 707 F.Supp. at 138. Moreover, the plaintiffs who actually sue "do not claim to be witnesses to anything other than their ownership of an interest in the dispute and their desire, and that of their lawyers, to represent others similarly situated." *Id.*

## A. *The Adequacy of Ontario as an Alternative Forum*

As noted, the first step in the *forum non conveniens* inquiry is to determine whether there is an adequate alternative forum for litigation of plaintiffs' claims. An alternative forum is adequate if "(1) the defendants are subject to service of process there; and (2) the forum permits 'litigation of the subject matter of the dispute.'" *Alfadda,* 159 F.3d at 45 (quoting *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252); *accord Capital Currency,* 155 F.3d at 609. That the law of the foreign forum "differs from American law 'should ordinarily not be given conclusive or even substantial weight' in assessing the adequacy of the forum." *Alfadda,* 159 F.3d at 45 (quoting *Piper,* 454 U.S. at 247, 102 S.Ct. 252). Nevertheless, in "rare circumstances," where the remedy offered by an alternative forum "is so clearly inadequate or unsatisfactory that it is no remedy at all," an unfavorable change in law that would result from suing in the alternative forum "may be given substantial weight." *Piper,* 454 U.S. at 254 & n. 22, 102 S.Ct. 252.

Defendants contend that Ontario, Canada is an adequate alternative forum. In response, plaintiffs argue that Ontario is inadequate because: (1) there is "substantial uncertainty" whether an Ontario court would exercise jurisdiction over all the Underwriter Defendants (Pl. Mem. at 14–15)[1]; (2) Ontario would not recognize plaintiffs' claims against the Underwriter

---

1. "Pl. Mem." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants'

Motions to Dismiss on the Grounds of *Forum Non Conveniens,* dated December 9, 1998.

Defendants, which are based on a public offering within the United States to American investors (*see id.* at 15–16); (3) Ontario law "may" preclude plaintiffs from asserting "*any* claims for damages" against Deloitte, as PSC's auditor (*id.* at 16); and (4) Ontario lacks an "effective comparable class action remedy" for defrauded investors. (*Id.* at 2, 16–18) I will discuss each of plaintiffs' objections in turn.

■ Plaintiffs' first objection, that Ontario courts might not exercise jurisdiction over the Underwriter Defendants, is easily rejected. In joining the present motions to dismiss, the Underwriter Defendants have explicitly consented to Canadian jurisdiction. (*See* 12/23/98 Letter Br. from Brad S. Karp at 3) Thus, to the extent that plaintiffs' objection is premised on the assumption that Canadian courts would not have personal jurisdiction over the Underwriter Defendants, that objection is moot. *See PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 74–75 (2d Cir.1998); *cf. R. Maganlal & Co.,* 942 F.2d at 167 (stating that dismissal on *forum non conveniens* grounds can be conditioned on a defendant's consent to jurisdiction in the foreign forum); *In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195, 203–04 (2d Cir.1987) (same).

Nevertheless, plaintiffs appear to argue also that Ontario courts might choose to abstain from exercising their jurisdiction over the Underwriter Defendants, on *forum non conveniens* grounds. (*See* Jack Decl. ¶¶ 9–10; 12/31/98 Letter Br. from Neil L. Selinger & Jeffrey C. Block at 2) However, in the event that this action is dismissed and a similar lawsuit is commenced in Ontario, neither plaintiffs nor defendants are likely to move—or to be in a position to move—the Ontario court to dismiss the new action on *forum non conveniens* grounds. (*See* La Forest Decl.

¶¶ 5–6) Moreover, even assuming the issue could be raised, it is hard to imagine that an Ontario court would dismiss the action in deference to the United States knowing that a U.S. District Court had already ruled that Ontario was the more appropriate and convenient forum. *Cf. Schertenleib v. Traum,* 589 F.2d 1156, 1163 (2d Cir.1978) (stating that the "unlikely possibility that the plaintiff may ultimately have to return to the inconvenient forum is a factor to be weighed in deciding whether to dismiss, but this kind of improbability should not automatically preclude the use of forum non conveniens").

■ Next, plaintiffs argue that they might be precluded from bringing statutory claims against the Underwriter Defendants in Ontario because there is no equivalent under Ontario statutory law to sections 11 and 12(a)(2) of the Securities Act. This objection is without merit, for two reasons. First, contrary to plaintiffs' assertion, there is an Ontario statute analogous to sections 11 and 12(a)(2) of the Securities Act. As defendants note, section 130 of the Ontario Securities Act, R.S.O. 1990 c.S.5,[2] establishes a statutory remedy for investors who purchase securities in a public offering where the prospectus contains a material misrepresentation.[3] (*See* Reuter Decl. ¶ 7) In addition, as even plaintiffs' expert in Canadian law acknowledges, plaintiffs would have several common law causes of action against the Underwriter Defendants in an action brought in Ontario. (*See* Jack Decl. ¶¶ 21–22) To be sure, it is not apparent from the record whether section 130 of the Ontario Securities Act and the Canadian common law causes of action apply to public offerings outside Canada. Notably, however, plaintiffs have failed to submit any authority holding that they do not.

---

2. The Ontario provision is attached as Exhibit A to Deloitte's Reply Memorandum of Law in Further Support of Its Motion to Dismiss, dated December 23, 1998.

3. Indeed, in the Menegon Class Action, currently pending in Ontario, plaintiffs assert claims against the Canadian Underwriters under section 130 of the Ontario Securities Act. (*See* Serio Decl. Ex. D)

In any event, whether section 130 of the Ontario Securities Act and Canadian common law would apply to plaintiffs' claims against the Underwriter Defendants appears to be irrelevant. As plaintiffs' expert acknowledges, an Ontario court "would in all likelihood be required to apply U.S. laws" to claims "against U.S. defendants in respect of American residents who purchased PSC securities [in the United States] under U.S. securities laws." (Jack Decl. ¶ 11; *see also* La Forest Decl. ¶ 16) Thus, an Ontario court would probably apply sections 11 and 12(a)(2) of the Securities Act to plaintiffs' claims against the Underwriter Defendants, leaving plaintiffs in the same position they were in here. That an Ontario court could be called upon to apply U.S. law might weigh in favor of maintaining the present action in the United States—an issue discussed further below—but the availability of a remedy under sections 11 and 12(a)(2) undermines plaintiffs' argument that Ontario is an inadequate forum with respect to their claims against the Underwriter Defendants. *Cf. Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 952 (1st Cir.1991) (Breyer, C.J.) (concluding that Canada is an adequate alternative forum for a shareholder lawsuit in part because "Canadian courts will either apply American law or they will apply Canadian laws that offer shareholders somewhat similar protections by forbidding misrepresentation and fraud and imposing fiduciary obligations" (citations omitted)).

■ Plaintiffs' third objection to Ontario is that they "may" be precluded from asserting claims for damages against Deloitte. In support of their motions to dismiss, defendants submit a declaration from Robert Reuter, an expert in Canadian law, discussing several claims that plaintiffs could assert in Ontario, including conspiracy, fraud or deceit, negligent misrepresentation, fraudulent misrepresentation and derivative claims. (*See* Reuter Decl. ¶¶ 7–13) In response, plaintiffs' expert questions the adequacy of only one of these potential claims, arguing that Canadian law does not permit shareholders to bring a claim for negligent misrepresentation against auditors based on damages to share value. (*See* Jack Decl. ¶ 26) By their silence, plaintiffs concede that the other claims discussed by Reuter are available against Deloitte, and thus that they are not without a "remedy at all." *Piper*, 454 U.S. at 254, 102 S.Ct. 252.

To be sure, litigating this case in Ontario might prevent plaintiffs from availing themselves of some benefits of U.S. securities laws. *Forum non conveniens* dismissal, however, "is not trumped simply because the foreign forum will apply different substantive law than an American court." *Capital Currency*, 155 F.3d at 609–10. Indeed, "[t]he availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum." *PT United Can*, 138 F.3d at 74. A foreign forum is adequate even if the remedies available in that forum are only "roughly analogous" to those available in the United States, *Capital Currency*, 155 F.3d at 610, or if the foreign remedies "adequately address the underlying controversy expressed in [the] plaintiff's complaint." *PT United Can*, 138 F.3d at 74; *cf. Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 129–30 (2d Cir.1987) (per curiam) (holding that dismissal was proper notwithstanding that the plaintiff could not bring a RICO claim in the alternative forum because a fraud claim provided an adequate substitute); *Lana Int'l Ltd. v. Boeing Co.*, No. 93 Civ. 7169(LLS), 1995 WL 144152, at *2 (S.D.N.Y. Mar.30, 1995) (holding that several common law claims provided an adequate substitute for the plaintiff's claim under the Lanham Act, which was "not cognizable in Canadian courts").

■ Plaintiffs' final objection to Ontario, that the forum lacks an "effective comparable class action remedy" for defrauded investors, is more weighty than the other three. The objection arises from an interaction between substantive and procedural

law. Ontario, it appears, does not recognize the so-called fraud-on-the-market theory accepted by the Supreme Court in *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). (*See* Reuter Decl. ¶ 10(iv); Jack Decl. ¶¶ 23–24; Brown Decl. Ex. A) Under that theory, purchasers are not required to prove specific reliance on false information in order to establish a claim under section 10(b) of the Exchange Act or SEC Rule 10b–5. Instead, it is assumed that the purchasers relied on the accuracy of the stock price and that the price reflected all available information in the market. *See Basic,* 485 U.S. at 247, 108 S.Ct. 978. Without recognition of this theory, plaintiffs argue, "individual issues of reliance raise significant obstacles to certification of a class under [Ontario] law." (Pl. Mem. at 16; *see also* Jack Decl. ¶ 25)

In support of their argument, plaintiffs cite *Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003 (D.N.J.1996), and *Trafton v. Deacon Barclays de Zoete Wedd Ltd.,* No. C 93–2758–FMS, 1994 WL 746199 (N.D.Cal. Oct.21, 1994), both of which held, on precisely the ground urged by plaintiffs, that Ontario was not an adequate alternative forum for litigation of a securities class action under section 10(b) of the Exchange Act and Rule 10b–5. As the *Trafton* Court reasoned:

> While ... Ontario courts have class action procedures, in the context of a claim for secondary market securities fraud, this device is virtually meaningless without having fraud-on-the-market substitute for actual reliance. It is hard to see how the plaintiff class can obtain class certification, much less ultimate relief, under these circumstances.

*Trafton,* 1994 WL 746199, at *12; *accord Derensis,* 930 F.Supp. at 1008 (citing *Trafton,* 1994 WL 746199, at *12).

*Derensis* and *Trafton* appear to be the only cases directly on point. Nevertheless, neither case is controlling on this court, and I find their conclusions unper-

suasive. Most significantly, both courts ignored a crucial distinction between U.S. and Ontario class action certification requirements. In the United States, to certify a class action pursuant to Rule 23(b)(3)—the conventional basis for a securities fraud class action—it is necessary to demonstrate, *inter alia,* that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3); *see, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 2249–50, 138 L.Ed.2d 689 (1997) (discussing Rule 23(b)(3)). In Ontario, by contrast, a plaintiff need not show that common issues predominate to obtain class certification. (*See* La Forest Decl. ¶¶ 12–13) So long as the class members' claims or defenses "raise common issues" and a "class proceeding would be the preferable procedure for resolution of common issues," certification is appropriate under Ontario law. *Derensis,* 930 F.Supp. at 1007–08 (quoting the Ontario Class Proceedings Act § 5(1), which establishes the requirements for class certification).

This distinction is significant. The so-called predominance requirement of Rule 23(b)(3) was a major reason why U.S. courts adopted the fraud-on-the-market theory in the first place. *See Basic,* 485 U.S. at 242, 108 S.Ct. 978 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones."); *see also, e.g.,* Barbara Black, *Fraud on the Market: A Criticism of Dispensing with Reliance Requirements in Certain Open Market Transactions,* 62 N.C. L.Rev. 435, 439–40 (1984), *cited in Basic,* 485 U.S. at 247 n. 26, 108 S.Ct. 978; R. Douglas Martin, Note, *Basic Inc. v. Levinson: The Supreme Court's Analysis of Fraud on the Market and Its Impact on the Reliance Requirement of SEC Rule 10b–5,* 78 Ky.

L.J. 403, 432 (1989/1990). Corresponding-ly, the absence of a predominance require-ment in Ontario law is a major reason why Ontario courts have rejected the fraud-on-the-market theory. *See, e.g., Carom v. Bre–X Minerals Ltd.,* No. 97–GD–39574 *et al.,* 1998 ACWSJ LEXIS 49572, at *28–29 (Ontario Ct., Gen. Div. Nov. 4, 1998) ("[C]entral to the development of the [fraud-on-the-market] theory's presump-tion of reliance aspect in the United States is the requirement of a predominance of common issues for class action certification .... In comparison, the predominance of common issues requirement has not been incorporated [into Ontario law]."), *attached as* Exhibit A to the Declaration of James W. Brown. Thus, the premise underlying the *Trafton* and *Derensis* Courts' analy-ses—that the class action device is "virtu-ally meaningless" in the absence of the fraud-on-the-market theory—is false. Even assuming *arguendo,* therefore, that an inability to obtain class certification in Ontario would be relevant and material, the absence of the fraud-on-the-market theory does not render that forum inade-quate. If anything, in fact, it looks easier to get class certification under Ontario law than under U.S. law.[4] *See also Union Carbide,* 809 F.2d at 199 (affirming *forum non conveniens* dismissal of a class action lawsuit based on the Bhopal plant disaster, notwithstanding the "absence in India of a class action procedure comparable to that in federal courts here").

██ Perhaps recognizing this fact, plaintiffs press two additional reasons why Ontario's class action procedures render Ontario inadequate. First, citing the re-cent passage of Ontario's class action stat-ute in 1993, plaintiffs contend that Ontario is "in the relatively early stages of devel-oping and applying the principles govern-ing class actions, particularly in the realm of securities litigation," and that few secu-rities class actions, if any, have "actually proceeded on through trial and appeal." (Jack Decl. ¶ 27; *see also* 12/31/98 Letter Br. from Neil L. Selinger & Jeffrey C. Block at 2) Second, plaintiffs contend that, even if class action certification could be obtained in Ontario, the requirement of proving individual reliance could be pro-hibitively expensive. (*See* Pl. Mem. at 18; 12/31/98 Letter Br. from Neil L. Selinger & Jeffrey C. Block at 1–2) These argu-ments are without merit.

First, that Ontario's class action statute is "untested," *Trafton,* 1994 WL 746199, at *12, is irrelevant to whether Ontario is an adequate forum for *forum non conveniens* purposes. Indeed, the Second Circuit con-sidered and rejected just such an argu-ment in *Capital Currency,* an antitrust case in which the plaintiffs had argued that England was an inadequate forum because no English court had "ever awarded mon-ey damages" in an antitrust suit. Relying on "considered *dicta*" from a case decided by the Law Lords of the House of Lords, the Court concluded that an English court could lawfully award damages, and held that this showing was sufficient. *Capital Currency,* 155 F.3d at 610. "[A]lthough English courts have not *yet* awarded dam-ages in an antitrust case," the Court rea-soned, "it appears that English courts have the power to do so." *Id.*

The circumstances of this case are not as stark as those in *Capital Currency.* Indeed, contrary to plaintiffs' representa-tions, it appears that class actions, even in secondary market securities fraud cases, are becoming more common in Ontario.

---

4. Moreover, even if Ontario did have a predo-minance requirement, it would not necessari-ly follow that the forum would be inadequate for litigation of a securities class action. In the years before the Supreme Court adopted the fraud-on-the-market theory in *Basic,* sev-eral U.S. courts, including the Second Circuit, allowed shareholder suits to proceed as class actions, notwithstanding the requirement of proving individual reliance. *See, e.g., Green v. Wolf Corp.,* 406 F.2d 291, 301 (2d Cir.1968); *see also Eisenberg v. Gagnon,* 766 F.2d 770, 785–86 (3d Cir.1985) (citing cases). To the extent that plaintiffs had to prove individual reliance, these courts reasoned, "it would be more efficient to order separate trials, if nec-essary, limited to the issue of reliance." *Ei-senberg,* 766 F.2d at 786.

(*See* La Forest Decl. ¶¶ 7–8) Plaintiffs in *Carom v. Bre–X Minerals Ltd.*, for example, are proceeding as a class (*see* Brown Decl. Ex. A); in fact, plaintiffs' own expert is serving as part of the "plaintiffs' class action counsel team." (Jack Decl. ¶ 24 n. 18) Moreover, there is a class action pending in connection with this very case. (*See* Serio Decl. Ex. D) Thus, it is plain that Ontario "permits 'litigation of the subject matter of the dispute,'" which is all that is required. *Capital Currency*, 155 F.3d at 609 (quoting *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. 252).

Plaintiffs' final argument—that the unavailability of the fraud-on-the-market theory would make litigating in Ontario prohibitively expensive—is unfounded also.. To begin with, it is hardly evident that the requirement of proving individual reliance would be especially expensive. For example, an Ontario court could proceed, as defendants suggest, by way of affidavits or post-verdict summary hearings (*see* PSC Parties' Reply Mem. at 17), neither of which would be prohibitively expensive. More significantly, that it might be more expensive to proceed in Ontario is irrelevant to the inquiry into adequacy. *See, e.g., Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir.1996) ("[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in federal district courts does not render an alternative forum inadequate." (internal quotation marks and citation omitted)); *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 515 & n. 32 (S.D.N.Y.1982) (Weinfeld, J.) ("Procedures in foreign courts need not be identical to U.S. procedures as long as the alternative forum is not 'wholly devoid of due process.'") (quoting *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 159 n. 16 (2d Cir.1980) (en banc)). It may be that such a cost is relevant to the private interest factor analysis discussed further below, *cf. Trafton*, 1994 WL 746199, at *13 (holding that the expense arising from "the fact that each class member would have to prove actual reliance" is a private interest factor weighing against dismissal), but it should not be a factor in assessing the adequacy of the foreign forum at the first step of the *forum non conveniens* analysis.

In short, because Ontario permits litigation of the subject matter of plaintiffs' complaint, I find that it is an adequate alternative forum. Plaintiffs' strenuous objections notwithstanding, this finding should not be surprising. With the exception of the *Trafton* and *Derensis* Courts, every court to consider whether Ontario is an adequate forum—including at least two in securities cases—has held that it is. *See, e.g., Howe*, 946 F.2d at 950–52; *DeYoung*, 707 F.Supp. at 135–37; *see also Lana Int'l*, 1995 WL 144152, at *1–3 (finding Ontario adequate in a suit alleging, *inter alia*, violations of the Lanham Act, common law fraud, breach of warranty and breach of contract); *cf. John Labatt Ltd. v. Onex Corp.*, 890 F.Supp. 235, 241–42 (S.D.N.Y.1995) (discussing the similarity between U.S. and Canadian securities laws). To be sure, there are, as these courts found, "small differences in standards and procedural differences (such as greater difficulty in meeting class action requirements ... )" between Ontario and U.S. law, but such differences are "beside the point." *Howe*, 946 F.2d at 952 (citing *Piper*, 454 U.S. at 254, 252 n. 18, 102 S.Ct. 252); *see DeYoung*, 707 F.Supp. at 135–37.

### B. *Balancing the Gilbert Factors*

■ Having found that Ontario provides an adequate alternative forum for this dispute, I must now weigh the private and public interest factors enumerated in *Gilbert*, and decide—paying proper deference to plaintiffs' choice of forum—whether the balance of convenience favors trial here or in Ontario. The private interest factors enumerated in *Gilbert* include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, wit-

nesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. The public interest factors include:

the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper,* 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citing *Gilbert,* 330 U.S. at 509, 67 S.Ct. 839). Within the Second Circuit, it is well settled that a court "must 'adher[e] to the simple uniform standard of *Gilbert* in all instances.'" *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.1993) (quoting *Alcoa S.S. Co.,* 654 F.2d at 153) (alteration in original).

### 1. *The Private Interest Factors*

In the present case, the private interest factors strongly favor litigation in Ontario. The gravamen of plaintiffs' complaint is that a Canadian company, with its directors, officers, underwriters and auditor, many of whom are Canadian, committed securities fraud by knowingly or recklessly overstating its copper inventory, overstating its earnings, understating its liabilities and failing to record known liabilities and inter-company transactions properly. (*See* Compl. ¶¶ 3–4) Most of these activities took place in Ontario. Thus, it is in Ontario that most of the key witnesses and the vast bulk of relevant evidence can be found.

First, and most significant, several important third-party witnesses are located in Canada who could be compelled to testify by an Ontario court, but not by an American court. These witnesses include,

among others, Peter McQuillan, the former Comptroller of PSC's Scrap Metals Division, and Greg Madesker and Rik Barrese, former traders in PSC's Metals Recovery Division. The conduct of these parties is central to the allegations in plaintiffs' complaint, and their testimony will likely be crucial in resolving the dispute. (*See, e.g.,* Compl. ¶¶ 187, 202, 207–12, 214, 239–59, 332) Thus, the inability of a U.S. court to compel their live testimony supports *forum non conveniens* dismissal. *See, e.g., Schertenleib,* 589 F.2d at 1165 (describing the inability to bring witnesses to the United States for "live cross-examination before a factfinder" as "[p]erhaps the most significant problem" justifying dismissal). Indeed, this factor takes on added importance here, because "fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor evidence essential to a fair trial." *Howe,* 946 F.2d at 952; *see Alfadda,* 159 F.3d at 48 ("The ability to secure witness testimony takes on added importance in this action because 'where, as here, appellants have alleged fraud, live testimony of key witnesses is necessary so that the trier of fact can assess the witnesses' demeanor.'" (quoting *Allstate,* 994 F.2d at 1001)); *ACLI Int'l Commodity Servs. v. Banque Populaire Suisse,* 652 F.Supp. 1289, 1295 (S.D.N.Y. 1987) ("The compelling consideration in this case is the inability of the court or parties to guarantee the live testimony at trial in New York of those witnesses with uniquely first-hand knowledge of the fraud with which defendant BPS is charged .... No other private or public interest present in this case approaches this consideration in importance.").

Next, most, if not all, of the important defendants are located in Ontario: PSC is headquartered in Ontario (*see* Compl. ¶ 48); of the company directors and officers named as defendants, all but four—directors Felix Pardo, Norman Foster, William Haynes and Robert Knauss—live and work in Ontario (*see* Soule Decl. ¶¶ 4–

5); and Deloitte is located in Ontario. (*See* Matz Decl. ¶ 2) The cost for these defendants and witnesses associated with these defendants to attend trial, therefore, will be substantially less if trial is held in Ontario. *See Alfadda*, 159 F.3d at 47 ("[T]he cost for witnesses to attend trial will be significantly lessened if trial is held in France because almost all the entities involved are based there."); *cf. Capital Currency*, 155 F.3d at 611; *Blanco*, 997 F.2d at 982; *Allstate*, 994 F.2d at 1001.

To be sure, as plaintiffs emphasize, the 17 Underwriter Defendants, Pardo, Foster, Haynes and Knauss are located in the United States. But it does not necessarily follow that many witnesses will be located in the United States. The Underwriter Defendants are named in only two of the 11 claims for relief asserted in plaintiffs' complaint, and their liability is entirely derivative of PSC's and the other Canadian defendants'. (*See* Compl. ¶¶ 2, 3, 84, 139, 338, 341–43, 387, 195) As for the four individual defendants who live in the United States, none of whom lives in New York (*see* Soule Decl. ¶ 5), defendants Haynes and Knauss became directors of PSC only in August 1997, as a result of PSC's acquisition of Allwaste, and are specifically named in only three paragraphs of the complaint. (*See* Compl. ¶¶ 60–61, 238) Thus, these defendants are less central to resolution of the dispute than the defendants located in Ontario.

Finally, just as most of the important defendants are located in Ontario, the vast bulk of the relevant documentary evidence is in Ontario. Deloitte conducted its 1995 and 1996 audits out of its Mississauga, Ontario office, and its papers relating to these audits are located in Ontario. (*See* Matz Decl. ¶¶ 3–4) Similarly, PSC's books and records are predominantly in Ontario, as are the company's documents relating to its copper inventory and the preparation of its financial statements and securities disclosures. (*See* Soule Decl. ¶ 7) Again, some relevant documents might be located in the United States—for instance, documents in the possession of the Underwriter Defendants, Allwaste or Serv–Tech—but these documents do not compare, in either quantity or importance, to those located in Ontario. Thus, this factor weighs also in favor of *forum non conveniens* dismissal. *See, e.g., Alfadda*, 159 F.3d at 47; *Capital Currency*, 155 F.3d at 611; *Blanco*, 997 F.2d at 982; *Allstate*, 994 F.2d at 1001.

To overcome the compelling weight of these factors, plaintiffs cite various connections between this dispute and the United States. For instance, they note that PSC had its "primary base of operations" in the United States and that 70% of the company's revenue was generated here (*see* Selinger Decl. ¶ 2); that during the class period, PSC acquired several American companies, including Allwaste and Serv–Tech (*see id.* ¶ 3; *see also id.* ¶ 15); that many of PSC's major customers were large American corporations, including at least two which might be subject to third-party discovery (*see id.* ¶¶ 4, 16); that the larger of the two November 1997 public offerings was prepared in the United States, by American entities, and offered exclusively to American investors (*see id.* ¶¶ 6–13); that Deloitte is a "member" of a "world-wide affiliation of firms" headquartered in New York (*see id.* ¶ 17(a)); and that members of Deloitte's Ontario office discussed the PSC audit with members of the New York office on at least one occasion. (*See id.* ¶ 17(b); *see also* Compl. ¶¶ 307–09) Several of these connections are, in fact, relevant to resolution of this dispute and, to that limited extent, will make litigating in Ontario less convenient. But, in general, plaintiffs' "attempt[ ] to morphose this case into a dispute that concerns the United States" is without merit. *Capital Currency*, 155 F.3d at 612. At bottom, this case is about fraudulent conduct and improper record-keeping by a Canadian firm in Canada, and it involves the United States only indirectly or secondarily.

### 2. The Public Interest Factors

Few of the public interest factors enunciated by the *Gilbert* Court favor either Ontario or the United States for litigation of this dispute. For instance, although docket congestion is a "persistent affliction" of this court, *DeYoung*, 707 F.Supp. at 139, there is evidence that Ontario courts are similarly afflicted. (*See* Jack Decl. ¶ 12) In addition, whereas an Ontario court would probably apply U.S. law to plaintiffs' claims under sections 11 and 12(a)(2) of the Securities Act (*see* Jack Decl. ¶ 11; *see also* La Forest Decl. ¶ 16), it is likely that an American court would have to apply Canadian law to the claims brought by class members residing outside the United States based on the purchase of PSC securities outside the United States. *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir.1975) ("[T]he antifraud provisions of the federal securities laws ... [d]o not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States *directly* caused such losses." (emphasis added)); *accord Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 127–29 (2d Cir.1998) ("[A]ctivity in the United States that is 'merely preparatory' to a securities fraud elsewhere will not implicate our antifraud laws."), *cert. denied*, 119 S.Ct. 1029, 119 S.Ct. 1029, 143 L.Ed.2d 39 (1999); *see also Howe*, 946 F.2d at 953; *DeYoung*, 707 F.Supp. at 139.

Nevertheless, the "local interest in having localized controversies decided at home" weighs heavily in favor of litigation in Ontario. *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839. It is well established that a country's "interest ... in having controversies relating to one of its major corporations decided at home is substantial." *DeYoung*, 707 F.Supp. at 139; *see Alfadda*, 159 F.3d at 46; *Allstate*, 994 F.2d at 1002. As discussed above, this case predominantly concerns the conduct of a major Canadian corporation in Canada, notwithstanding the involvement of some American entities and persons. In addition, a class action lawsuit and an action brought by PSC itself are already pending in connection with this dispute in Ontario. Thus, it would be "highly intrusive" for an American court to involve itself in a matter that has already engaged the judicial authorities of Canada. *Id.* at 139.

Plaintiffs note that PSC stock traded heavily on American stock exchanges and that many of the company's shareholders are U.S. citizens. These facts without more, however, do not warrant significant consideration. Parties who choose to engage in international transactions, as plaintiffs did here, " 'cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere.' " *Diatronics, Inc. v. Elbit Computers, Ltd.*, 649 F.Supp. 122, 129 (S.D.N.Y.1986) (quoting *Ionescu v. E.F. Hutton & Co. (France) S.A.*, 465 F.Supp. 139, 145 (S.D.N.Y.1979)), *aff'd*, 812 F.2d 712 (2d Cir.1987); *accord DeYoung*, 707 F.Supp. at 139; *see also Howe*, 946 F.2d at 953. Nor, for that matter, is the United States' interest in applying its laws to protect American investors and the integrity of American securities markets "overriding," as plaintiffs contend. (*See* Pl. Mem. at 27) Although this assertion finds some support in the case law, *see Alfadda*, 159 F.3d at 47 (citing cases); *see also Derensis*, 930 F.Supp. at 1011; *Trafton*, 1994 WL 746199, at *13, the Second Circuit has "never held that the United States' interest in applying its laws is a determinative factor to be considered in weighing convenience." *Capital Currency*, 155 F.3d at 611. To the contrary, the United States' interest in applying its own securities laws "is merely one consideration to be weighed in the totality of the *Gilbert* analysis." *Alfadda*, 159 F.3d at 47. Where, as here, the traditional *Gilbert* factors weigh heavily in favor of the foreign forum, and the foreign forum also has an

interest in applying its own securities laws, this "one consideration" is far from over-riding.

In sum, the balance of the *Gilbert* private and public interest factors strongly supports the conclusion that litigating this dispute in Ontario "will be most convenient and will best serve the ends of justice." *Peregrine Myanmar,* 89 F.3d at 46.

\* \* \* \* \* \*

For the foregoing reasons, defendants' motions to dismiss on *forum non conveniens* grounds are granted, and plaintiffs' complaint is dismissed.

SO ORDERED:

By prior opinion, familiarity with which is assumed, I dismissed plaintiffs' consolidated securities class action complaint on *forum non conveniens* grounds. Plaintiffs now move for reconsideration pursuant to Local Rule 6.3. Alternatively, plaintiffs move pursuant to Fed.R.Civ.P. 59(e) to alter or amend the order of dismissal to require waiver by each defendant of any statute of limitations defense. For the reasons stated below, plaintiffs' motion for reconsideration is denied, and plaintiffs' motion to amend is partially granted.

### I.

Local Rule 6.3, which governs a motion for reconsideration, requires that such a motion set forth "concisely the matters or controlling decisions which counsel believes the court has overlooked." The purpose of Rule 6.3 is to "'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" *Carolco Pictures Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988) (citation omitted). Thus, reconsideration is appropriate "only where the court has 'overlooked controlling decisions or factual matters put before it on the underlying motion,' and which, had they been considered, 'might reasonably have altered the result reached by the court.'" *U.S. Energy Sys., Inc. v. Enviro*

*Partners. L.P.,* No. 97 CIV. 1748(JFK), 1999 WL 294997, at \*1 (S.D.N.Y. May 11, 1999) (citations omitted). The proponent of a reconsideration motion "is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings." *de los Santos v. Fingerson,* No. 97 CIV. 3972(MBM), 1998 WL 788781, at \*1 (S.D.N.Y. Nov.12, 1998).

In the present case, plaintiffs advance five arguments for reconsideration of my prior opinion, all directed at the finding that Ontario is an adequate alternative forum for litigation of the dispute. Four of these arguments—that the absence of the fraud-on-the-market theory in Ontario precludes relief for "thousands of U.S. investors"; that a decision of the Ontario Superior Court dated May 13, 1999 prevents certification of securities class actions; that Ontario law precludes relief for "in-and-out" traders; and that Canadian law will apply to all of plaintiffs' claims—were not raised by plaintiffs in their earlier papers, and accordingly could not have been "overlooked." Plaintiffs' last argument—that they are prevented by Canadian law from maintaining any claim for damages against defendant Deloitte & Touche—was considered and rejected in my prior opinion, *see Philip Servs.,* 1999 WL 304690, at \*4–5, and plaintiffs have pointed to no controlling decision or factual matter that was "overlooked." None of these arguments would in any event change the outcome of my prior opinion. Under the circumstances, however, to provide an explanation for why this is so would subvert the purposes underlying Rule 6.3.

### II.

As noted, plaintiffs move in the alternative to amend or alter the order of dismissal to require that defendants waive any statute of limitations defense. Al-

though plaintiffs did not raise this issue in their earlier papers, the Second Circuit has cautioned that dismissal on *forum non conveniens* grounds should be conditional where plaintiffs might be barred by a statute of limitations from bringing a new action in the alternative forum. *See, e.g., Scottish Air Int'l. Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1235 (2d Cir.1996); *Calavo Growers of Cal. v. Generali Belgium,* 632 F.2d 963, 968 (2d Cir. 1980); *Schertenleib v. Traum,* 589 F.2d 1156, 1166 (2d Cir.1978). Accordingly, amendment of the order of dismissal is warranted.

 Nevertheless, a "less expansive waiver" than that urged by plaintiffs is "more appropriate" here. *Doe v. Hyland Therapeutics Div.,* 807 F.Supp. 1117, 1133 (S.D.N.Y.1992). Complete waiver by defendants of any statute of limitations defense would allow plaintiffs to benefit from any of their own delays in filing these actions in the United States as well as from delays after entry of the order of dismissal. Thus, dismissal will be conditioned on defendants' consenting to toll any applicable statute of limitations for the period that these consolidated actions were pending in the United States plus 30 days.[1] *Cf. Calavo Growers,* 632 F.2d at 968 (holding that dismissal should have been conditioned upon an agreement by the defendants "to waive any statute of limitations defense that has arisen since the commencement of the action in the Southern District [of New York]"); *Schertenleib,* 589 F.2d at 1166 (requiring as a condition of dismissal that the defendant waive "any statute of limitations defense that has arisen since the commencement of this action in the Southern District [of New York]").

\* \* \* \* \* \*

For the reasons stated above, and those unstated, plaintiffs' motion for reconsideration is denied. Plaintiffs' motion to amend the order of dismissal is granted, but only to the extent that each defendant must consent to the tolling of any applicable statute of limitations for the period that these actions were pending in the United States plus 30 days.

1. This condition of dismissal is unlikely to become a point of contention because defendants, in fact, already have consented to the tolling of any statute of limitations for the period plaintiffs' actions were pending in the United States. (*See* Deloitte Mem. at 25; PSC Parties' Mem. at 13; 6/8/99 Letter from Brad S. Karp at 2) An additional 30 days is warranted to allow plaintiffs a reasonable time following dismissal of this action to prepare and file a new complaint in Ontario.